UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ALAN BILAND, MATTHEW CRABB, TIFFANY RATCLIFF, and CARMELO TREVISO, individually and on Behalf of All Others Similarly Situated, | CASE NO.: |
| Plaintiffs, | |
| vs. | **NATIONWIDE CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT** |
| NATIONAL FOOTBALL LEAGUE, NATIONAL FOOTBALL MUSEUM, INC. dba PRO FOOTBALL HALL OF FAME, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs Alan Biland, Matthew Crabb, Tiffany Ratcliff, and Carmelo Treviso (collectively, "Plaintiffs") bring this suit against the National Football League and the National Football Museum, Inc. dba Pro Football Hall of Fame (collectively, "Defendants") to recover the damages owed to themselves and others similarly situated.

## PARTIES

1.      Plaintiff Alan Biland ("Biland") is an individual and a resident and citizen of Wisconsin, and a purchaser of tickets to the 2016 Hall of Fame Game scheduled for Sunday, August 7, 2016 between the Green Bay Packers and the Indianapolis Colts (the "2016 Hall of

Fame Game" or the "Game").   Biland is a representative plaintiff for the "Cancelled Game Class" defined below.

2.    Plaintiff Matthew Crabb ("Crabb") is an individual and a resident and citizen of Indiana, and a purchaser of a ticket to the 2016 Hall of Fame Game.  Crabb is a disabled veteran who served this country in Iraq, clearing routes for other members of the United States Armed Forces.  Crabb is a representative plaintiff for the "Cancelled Game Class" defined below.

3.    Plaintiff Tiffany Ratcliff ("Ratcliff") is an individual and a resident and citizen of Virginia, and a purchaser of tickets to the 2016 Hall of Fame Game.  Ratcliff's husband is a member of the United States Navy who took leave to attend the game with her.  Ratcliff is a representative plaintiff for the "Seatless Class" defined below.

4.    Plaintiff Carmelo Treviso ("Treviso") is an individual and a resident and citizen of Wisconsin, and a purchaser of tickets to the 2016 Hall of Fame Game.   Treviso is a representative plaintiff for the "Cancelled Game Class" defined below.

5.    Defendant National Football League (the "NFL") is an unincorporated association with two members in the State of Ohio and a principal place of business on Park Avenue in New York City, New York.

6.    Defendant National Football Museum, Inc. (the "Hall of Fame") is an Ohio corporation with its principal place of business in Canton, Ohio.

**JURISDICTION AND VENUE**

7.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as the proposed class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from the defendant, and seeks in the aggregate more than $5,000,000, exclusive of costs and interest.  On information and belief, more than two-thirds of the members of the Classes defined below are residents of states other than Ohio.

8.      The events as alleged herein arose within this District, pursuant to 28 U.S.C. § 1391(a), and within this Division, and one or more of the Defendants are subject to personal jurisdiction in the District and Division.

## FACTUAL ALLEGATIONS

**The NFL's History of Stadium Mismanagement.**

9.      The NFL unfortunately has a history of mismanaging the stadiums where its games are held.  For example, in 2011 the NFL held Super Bowl XLV and placed ticketholders in temporary seats with obstructed views.  Other ticketholders were unreasonably delayed, relocated or completely displaced from their seats as a result of the incomplete installation of temporary seats, which were deemed unsafe and unusable by the local fire marshall.  All of this occurred as a result of the NFL's wrongful mismanagement and knowing misconduct.  As alleged herein, this conduct has continued despite the above events at Super Bowl XLV.

10.     The NFL also unfortunately has a history of scheduling games on unsafe playing surfaces.  Indeed, it was only in July 2016 that the NFL established the Field Surface & Performance Committee, a committee intended to provide guidance regarding the safety and performance of NFL surfaces.

**The Mismangement of the 2016 Pro Football Hall of Fame Game.**

11.     The Pro Football Hall of Fame Game ("Hall of Fame Game") is an annual NFL exhibition game held during the weekend of the Pro Football Hall of Fame's induction ceremonies.  It is played at the Tom Benson Hall of Fame Stadium, adjacent to the Hall of Fame building in Canton, Ohio.  This game is highly anticipated, as it is the first game of the NFL's preseason.  Indeed, the TV ratings for this game routinely rival those of *playoff games* in other sports.  In fact, the 2015 game drew an estimated 11 million television viewers.  Tom Benson Hall of Fame Stadium has a capacity of approximately 22,000 seats and the Hall of Fame Game has historically sold out every year.

12.     The NFL has previously faced problems with the turf at the stadium, where Steelers kicker Shaun Suisham suffered a career-ending injury at the 2015 Hall of Fame Game. Following that game, the stadium began reconstruction.   However, unbeknownst to fans travelling to see the 2016 game, reconstruction was not completed in time for the 2016 game.

13.     For the August 7, 2016 game between the Green Bay Packers and Indianapolis Colts, Defendants imported a used FieldTurf playing surface from the Superdome in New Orleans.  Further, Defendants caused decking to be constructed over the field for an August 5 Tim McGraw concert and the Hall of Fame induction ceremony on August 6.

14.     As Defendants knew, but as fans would only later find out, as of the day of the game, insufficient seating had been installed for the number of ticket holders who would arrive that day, with entire sections of seats left unfinished.  This was in effect a replay of what transpired at Super Bowl XLV.

15.     Further, the decking that covered the field was not removed until 2:45 p.m. even though it was required to be removed by 8:00 a.m. Hours before the game was to start, the grounds crew, under the direction and supervision of Defendants, applied paint for the midfield logo and endzone lettering onto the field.  When the grounds crew determined the paint was not drying quickly enough, they heated the field to try to speed up the process.  Instead of rectifying the problem, this resulted in the melting of the rubber pellets that comprise the FieldTurf, creating a large slick, sticky, and congealed areas within the playing surface.

16.     Approximately 2.5 hours before the game, the stadium workers applied a substance to remedy the problems with the field.  However, a Green Bay Packers employee noticed the substance's label warned of burns upon skin contact.

17.     Even as it became clear that the game would not be played, Defendants continued to maintain a façade of normality for fans and the general public.  Even though the Colts and Packers were told the game had been cancelled at around 6:40 p.m., on information and belief, Defendants purposely told the fans nothing.  Instead, the scoreboard continued to tick down to an 8:00 p.m. kickoff that never happened.  On information and belief, by design, Defendants

allowed and encouraged fans to continue to purchase food, beverages, and souvenirs at the stadium as they waited for a game that would never start, and Defendants did so in the interest of money.

18.     It was not until approximately 8:00 p.m. that Hall of Fame President David Baker finally told the fans, many of when had travelled from around the country, that the game was cancelled.


**NFL Officials Purport to "Admit Responsibility"**

19.     On August 9, 2016, under increasing public pressure, Executive Vice President Troy Vincent sent a memo to the NFL teams wherein he admitted the NFL was responsible: "While the HOF field situation underscored the challenges in working with third parties, ultimately I am accountable for ensuring the field is of the highest standard." He also added that the league's football operations department "must demand and expect an extra level of detail in adhering to NFL standards ... for non-club fields."

20.     In addition, following the cancellation, Colts owner Jim Irsay was quoted as saying:  "This shouldn't happen . . . .  It's not difficult. Obviously everyone out there says, 'Hey you're a $12 billion league. How could you not have a field out there ready to go?' Well, the Hall of Fame is sort of separate and gets run a little differently from the league. But ... as owners, we'll have to get it right so it never happens again."


**Fans suffer significant damages.**

21.     As a direct result of the wrongful mismanagement and knowing misconduct of Defendants, Plaintiffs and similarly situated fans have suffered damages including but not limited to:  (1) the out-of-pocket cost of the tickets to attend the game; (2) lodging and travel expenses to attend the game; (3) costs associated with items purchased on the day of the game, including but not limited to items purchased while Defendants purposely concealed the fact that the game had

already been cancelled; and (4) missed hours and days of employment for certain fans who took vacation to attend the game.

22.     For example, Plaintiff Treviso took two days off of work to travel from Wisconsin with his son to the game and purchased tickets for $82 each plus shipping.  He also incurred travel expenses to attend the game and made purchases after entering the stadium, but before the game was cancelled at 8:00.

23.     For example, Plaintiff Crabb, although a disabled veteran, travelled from Indiana and purchased a ticket to the game.  He incurred travel expenses to attend the game and made purchases after entering the stadium, but before the game was cancelled at 8:00.

24.     Plaintiff Biland and his wife travelled seven hours from Wisconsin and stayed in Cleveland, Ohio.  Biland bought a package sold by the Hall of Fame that included the tickets.  He also paid $72 for parking and incurred travel expenses to attend the game.  After arriving at the stadium at approximately 6:45 p.m., he purchased items from the concession stands before being informed the game had been cancelled.

25.     Plaintiff Ratcliff and her husband drove from Virginia Beach, Virginia.  Ratcliff purchased tickets for herself and her husband, who is a member of the United States Navy and who took leave specifically to attend the game.  She also spent money on travel expenses and over $100 in pre-game activities.  After Ratcliff and her husband arrived at the stadium and had their tickets scanned, they were told their seat sections had not been completed and they had no seats.  They were not provided with any alternative seats for the game.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action on their own behalf, and as a class action on behalf of the Classes defined herein, pursuant to, and properly maintainable under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3).  The Classes consist of thousands of ticket holders to the 2016 Hall of Fame Game victimized by Defendants' breach of contract.  Specifically, Plaintiffs bring this suit on behalf of the following two Classes:

**The "Canceled Game Class"**:  All persons who paid for and/or acquired tickets to the 2016 NFL Hall of Fame Game. The class excludes counsel representing the class and all persons employed by said counsel and/or who attended the game at the invitation of counsel, governmental entities, the NFL, any entity in which the NFL has a controlling interest, the NFL's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.

**The "Seatless Class"**:  All persons who paid for and/or acquired tickets to the 2016 NFL Hall of Fame Game but did not in fact receive seats.  The class excludes counsel representing the class and all persons employed by said counsel and/or who attended the game at the invitation of counsel, governmental entities, the NFL, any entity in which the NFL has a controlling interest, the NFL's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.

27.    The NFL subjected Plaintiffs and each of their respective Classes to the same wrongdoing and harmed them in the same manner.  Now, Plaintiffs and each of their respective

Classes seek to enforce the same rights and remedies pursuant to the same legal theory: breach of contract.

28.  Numerosity:  The proposed classes are so numerous that individual joinder of all their members is impracticable.  While the exact number and identities of the Class Members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.  It is estimated that the "Canceled Game Class" consists of over 22,000 members.  It is estimated that the "Seatless Class" contains more than 50 members.  The disposition of the claims of these Class Members in a single class action will provide substantial benefits to all parties and to the Court.

29.  Typicality:  Plaintiffs' claims are typical of the claims of their respective Classes in that their claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and is based on the same legal theory as their claims.

30.  Adequacy of Representation:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Undersigned counsel has substantial experience in prosecuting complex lawsuits and class action litigation.  Plaintiffs and undersigned counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interests adverse to the Classes.

31.  Superiority of Class Action and Impracticability of Individual Actions: Plaintiffs and the members of the Classes suffered harm as a result of the NFL's unlawful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Individual joinder of all members of the Classes is impractical.  Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by the NFL's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class Members' claims in a single forum.  The conduct of this action as a class action conserves

the resources of the parties and of the judicial system, and protects the rights of the Class Members.  Adjudication of individual Class Members' claims with respect to Defendants would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other Class Members to protect their interests.

32.     <u>Common Questions of Law and Fact Predominate</u>:  In addition, the requirements of Federal Rule of Civil Procedure 23 are satisfied by questions of law and fact common to the claims of Plaintiffs and of each member of the Classes and which predominate over any question of law or fact affecting only individual members of the Classes.  Common questions of law and fact include, but are not limited to, the following:

a.     The questions of law and fact common to the Cancelled Game Class include the following:  (i) were members of the Cancelled Game Class entitled to watch the 2016 Hall of Fame Game?; (ii) was the cancellation of the game a breach of contract under the ticket contract?; and (iii) are members of the Cancelled Game Class entitled to damages for breach of contract?

b.     The questions of law and fact common to the Seatless Class include the following:  (i) were members of the Seatless Class denied a seat to watch the 2016 Hall of Fame Gmae?; (ii) was the denial of a seat a breach of contract under the ticket contract?; (iii) are members of the Seatless Class entitled to damages for breach of contract?

33.     <u>Notice</u>: Notice can be provided via internet publication, published notice and/or through mail and paid for by the NFL.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

**(By all Plaintiffs Against the Defendants)**

34. The allegations of paragraphs 1 through 33 are re-alleged and incorporated herein by reference, and Plaintiffs allege as follows a cause of action on behalf of themselves and the classes of similarly situated ticket holders.

35. Tickets to the Hall of Fame Game were originally sold to the fans, putative members of the classes and Plaintiffs by Defendants.

36. Accordingly, Plaintiffs entered into an agreement with Defendants whereby Plaintiffs were sold tickets for seats to the Hall of Fame Game on August 7, 2016.  These tickets comprise valid and enforceable contracts entitling all Plaintiffs to watch the game and for the "Seatless Class" to have seats at the game.

37. Plaintiffs fully and properly performed all conditions, covenants, and acts required to be performed on their part in accordance with the terms and conditions of the ticket purchases.

38. Defendants breached their obligations under the agreement to the "Cancelled Game Class" by cancelling the game due to factors under their control.

39. Defendants breached their obligations under the agreement to the "Seatless Class" by, among other things, failing to provide the assigned seat purchased by the ticket holder and/or due to the problems with the installation of some seats at Tom Benson Hall of Fame Stadium.

40. As a direct and proximate result of the NFL's breaches, Plaintiffs have sustained damages including, but not limited to:  (1) the out-of-pocket cost of the tickets to attend the game; (2) lodging and travel expenses to attend the game; (3) costs associated with items purchased on the day of the game, including but not limited to items purchased while Defendants purposely concealed the fact that the game had already been cancelled; and (4) missed hours and days of employment for certain fans who took vacation to attend the game.

41.     Defendants acted in bad faith and acted vexatiously, wantonly, obdurately, and oppressively in connection with the game.  Because of the NFL's history of incompetent stadium management, Defendants knew or should have known that they needed to closely supervise stadium setup to ensure the stadium was ready in time.  In addition, Defendants knowingly and intentionally failed to timely inform class members that the game would be cancelled even though they had already informed the Colts and Packers (and presumably TV executives) about the cancellation hours earlier.

42.     On information and belief, by failing to inform class members of the game's cancelation, Defendants purposely ensured they received significant profits from the sale of concessions and souvenirs purchased by class members as they waited in anticipation for the kickoff of a game that would never occur.  Defendants were in fact on notice that the stadium was ill-prepared to host the game shortly after 8:00 a.m., if not earlier, when the decking covering the field should have been removed.  The delay in removing the decking resulted in a delay in in painting the field and ultimately resulted in cancellation of the game.  Had Defendants notified class members about the game's cancellation well before the scheduled kickoff, class members could have mitigated their damages.  Instead, Defendants chose to proceed under the façade of normality, allow fans into the stadium, and reap profits on the sale of concessions and souvenirs while knowing all the while that the game would never even get to kick-off.

43.     All conditions proceeding to Plaintiffs' claims for relief have been performed or have occurred.

44.     Plaintiffs seek to recover actual damages outlined below from the Defendants as a direct and proximate result of the unlawful conduct of the NFL.

45.     Plaintiffs will show that Defendants acted in bad faith, vexatiously, wantonly, obdurately, and/or oppressively under Ohio law and will therefore seek to recover attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

46.     Plaintiffs seek to recover the following damages and obtain the following relief from Defendants:

(a)     Economic loss suffered by Plaintiffs;

(b)     All reasonable and necessary attorneys' fees;

(c)     Court costs;

(d)     Pre and post-judgment interest

(e)     And such other relief to which Plaintiffs may show themselves justly entitled.


DATED:  August 11, 2016                    /s/ *Romney Cullers*
                                           Romney Cullers
                                           Ohio Bar No. 0053668
                                           Michael F. Becker
                                           Ohio Bar No. 0008298
                                           THE BECKER LAW FIRM
                                           134 Middle Avenue
                                           Elyria, OH 44035
                                           E-Mail:      rcullers@beckerlawlpa.com
                                                        mbecker@beckerlawlpa.com
                                           Telephone:  440-323-7070

                                           Michael J. Avenatti (*Pro Hac Vice* Pending)
                                           California Bar Number:  206929
                                           EAGAN AVENATTI, LLP
                                           520 Newport Center Drive, Suite 1400
                                           Newport Beach, CA 92660
                                           E-Mail:      mavenatti@eaganavenatti.com
                                           Telephone:   949-706-7000

## **JURY DEMAND**

Plaintiffs hereby demand a trial of all causes by jury.


DATED:  August 11, 2016          /s/ *Romney Cullers*                              
                                 Romney Cullers
                                 Michael F. Becker
                                 THE BECKER LAW FIRM

                                 Michael J. Avenatti (*Pro Hac Vice* Pending)
                                 EAGAN AVENATTI, LLP